UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| RHONDA BRADD, *as Administrator of the Estate of Adrian Bradd a/k/a Robert Harris, deceased*, | )<br>)<br>)<br>) |
| Plaintiff, | ) No. 2:14-cv-00177-JMS-DKL |
| vs. | )<br>)<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | ) |

## ORDER

Presently before the Court in this action brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, is Defendant United States' Motion for Summary Judgment. [Filing No. 73.]

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on

1

matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following statement of facts was evaluated pursuant to the standards set forth above. That is, the facts stated are not necessarily objectively true, but as the summary judgment standard required, the undisputed facts and the disputed evidence are presented in the light most favorable to Plaintiff Rhonda Bradd, as Administrator of the Estate of Adrian Bradd (the "Estate"), as the non-moving party, drawing all reasonable inferences in its favor. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

At all times relevant to this litigation, Adrian Bradd was an inmate at the minimum security "Camp" in the Federal Correctional Complex ("FCC") located in Terre Haute, Indiana. [Filing No. 80-3 at 5.] His projected date of release was July 30, 2018. [Filing No. 74-1 at 3.] On January 22, 2012, he died while in custody. [Filing No. 74-1 at 1.]

On January 19, 2012, three days before his death, Mr. Bradd visited with Dr. William Wilson, a physician and Clinical Director of the Health Services Program for the Bureau of Prisons. [Filing No. 80-4 at 5; Filing No. 80-4 at 11-12; Filing No. 80-4 at 48-51.] At that time, Dr. Wilson noted that Mr. Bradd was experiencing dyspepsia (a gas or "heartburn type" feeling) but was not in any pain. [Filing No. 80-4 at 12; Filing No. 80-4 at 48.] Dr. Wilson also recorded that during his examination, he heard an arterial bruit in the epigastric region (just below the breastbone), which he described as "a washing machine type sound when you listen over the arteries." [Filing No. 80-4 at 12-13; Filing No. 80-4 at 47-49.] Dr. Wilson testified that the presence of an arterial bruit can be significant—possibly indicative of an aneurysm, although less than ten percent of aneurysms are accompanied by a bruit—or it could have no clinical

3

significance—a bruit can be a "normal finding" in a skinny person (which Mr. Bradd was), a young to middle-aged person with "tortuous type vasculature," or a person who had previously had surgery (as Mr. Bradd had). [Filing No. 80-4 at 13.] Dr. Wilson further testified that he was concerned that Mr. Bradd was not taking his medications as directed, and that he had advised Mr. Bradd about compliance with his regimen and switched Mr. Bradd to his schedule to facilitate observation and follow-up. [Filing No. 80-4 at 13-14; Filing No. 80-4 at 51.] Dr. Wilson also ordered an aortic ultrasound to further explore the bruit. [Filing No. 80-4 at 16; Filing No. 80-4 at 47.] However, Dr. Wilson testified that he did not believe it was likely that Mr. Bradd had an aneurysm, as he did not feel "a pulsatile mass" in Mr. Bradd's abdomen during the examination, and he stated that it is statistically improbable that an undetectable aneurysm could have grown and ruptured, causing an aortic dissection, over the course of the next three days. [Filing No. 80-4 at 18.]

Officer John Timcheck is a Senior Officer Specialist at FCC and was on duty on January 22, 2012. [Filing No. 80-3 at 4-7.] He testified that shortly after he began his shift at 8:00 a.m. on that day, he was made aware of medical concerns regarding Mr. Bradd and learned that Mr. Bradd had been experiencing abdominal pain since the previous night. [Filing No. 80-3 at 6-10.] Throughout the morning, Officer Timcheck observed for himself that Mr. Bradd was experiencing abdominal pain. [Filing No. 80-3 at 8.] At approximately 8:30 a.m., Officer Timcheck called the prison medical unit to report Mr. Bradd's condition. [Filing No. 80-3 at 8.] He spoke to Stephen Mize, a registered nurse with the Federal Bureau of Prisons, who later arrived at FCC and examined Mr. Bradd. [Filing No. 80-3 at 8-9; Filing No. 80-5 at 4.]

During the examination, Nurse Mize noted that, while Mr. Bradd's vital signs were generally within the normal range, he had a slightly elevated pulse, reported burning pain in his

4

abdomen at a level of ten on a ten-point scale, and requested to be taken to the hospital. [Filing No. 74-4 at 4-5; Filing No. 80-5 at 5-8.] Nurse Mize also recorded what he described as "normal" findings, including a soft and nondistended abdomen, normal bowel sounds, and a lack of rebound tenderness. [Filing No. 74-4 at 4-5; Filing No. 80-5 at 8-9.] No examination was conducted to locate or investigate an arterial bruit. [Filing No. 80-5 at 9.] Nurse Mize proceeded to call Dr. Tabor, a physician assistant on call, and Dr. Wilson, both of whom advised Nurse Mize that it was not necessary to send Mr. Bradd to the hospital. [Filing No. 80-4 at 18-20; Filing No. 80-5 at 6.] Nurse Mize testified that Mr. Bradd did not report a type of pain that he believed would be indicative of an aortic aneurysm or dissection. [Filing No. 80-5 at 9.] Mr. Bradd was given an antacid and Nurse Mize indicated in his report the need for a follow-up the next morning at sick call. [Filing No. 74-4 at 5; Filing No. 80-3 at 9.]

Following the examination by Nurse Mize, Mr. Bradd continued to complain of abdominal pain and other inmates began to report to prison staff that Mr. Bradd needed medical attention. [Filing No. 80-3 at 9.] Officer Timcheck called medical for a second time at approximately 10:15 a.m. [Filing No. 80-3 at 9.] Medical staff told Officer Timcheck that they would send someone to assess Mr. Bradd as soon as someone became available, though Nurse Mize was "tied up with something else" at the time of the call. [Filing No. 80-3 at 10.] Officer Timcheck testified that he checked on Mr. Bradd numerous times throughout the day and called medical several times to keep the medical staff apprised of Mr. Bradd's condition. [Filing No. 80-3 at 11-12.] Officer Timcheck also recalled that he received an "almost nonstop" stream of complaints from other inmates requesting medical attention for Mr. Bradd. [Filing No. 80-3 at 9.] However, Officer Timcheck did not try to make arrangements for Mr. Bradd to be taken to the hospital because, in

5

the absence of a "clear cut emergency," medical staff, and not correctional officers, are primarily responsible for making the decision to transport an inmate. [Filing No. 80-3 at 12.]

At approximately 2:30 p.m., Officer Timcheck and another correctional officer entered Mr. Bradd's cell in response to another inmate's report of a medical situation involving Mr. Bradd. [Filing No. 80-3 at 11-13.] Officer Timcheck observed that Mr. Bradd had thrown up on himself and was breathing but "not really coherent," so he made the decision to call for medical assistance. [Filing No. 80-3 at 13.] At 2:37 p.m., Nurse Annah Smith arrived at the Camp after being told Mr. Bradd was possibly having a seizure. [Filing No. 74-4 at 1; Filing No. 80-3 at 23.] When she arrived, Mr. Bradd was unresponsive and she could not detect a pulse or respirations. [Filing No. 74-4 at 1.] Nurse Smith informed Officer Timcheck that Mr. Bradd would need to be transported to the hospital by ambulance. [Filing No. 80-3 at 23.] Mr. Bradd was then moved to the medical room and CPR was commenced by a member of the prison staff. [Filing No. 80-5 at 12.] An ambulance arrived at the Camp at 2:48 p.m. and departed with Mr. Bradd at 3:05 p.m. [Filing No. 80-3 at 23.] Mr. Bradd was subsequently pronounced dead at the hospital. [Filing No. 74-3 at 21; Filing No. 74-8 at 5.]

Dr. Roland M. Kohr, M.D., a forensic pathologist, performed an autopsy on Mr. Bradd's body on January 23, 2012. [Filing No. 74-3 at 20-25.] During the examination, Dr. Kohr found cysts in the kidney (Mr. Bradd only had one kidney, as the other had been removed), calcific atherosclerosis (hardening) of the aorta, and metastatic carcinoma (cancer) in various locations. [Filing No. 74-3 at 5-6; Filing No. 74-3 at 22-23.] Specifically, he discovered a six centimeter mass in the chest, and a tumor in the liver. [Filing No. 74-3 at 9; Filing No. 74-3 at 22-23.] Dr. Kohr concluded that the cause of death was "metastatic malignancy, source undetermined," which

he explained to mean cancer. [Filing No. 74-3 at 5, 20.] He found no evidence of aneurysm, coarctation, dissection, or laceration of the aorta. [Filing No. 74-3 at 23.]

Dr. James Bryant, M.D., performed a second-look autopsy on January 30, 2012. [Filing No. 80-1 at 7; Filing No. 80-1 at 20-25.] He noted cysts in the kidney, which he did not believe to be relevant to the cause of death, and also determined that the lungs showed congestion and edema, which he stated indicate that Mr. Bradd died over the course of a few minutes and not suddenly. [Filing No. 80-1 at 9-10, Filing No. 80-1 at 21.] Dr. Bryant concluded that the cause of Mr. Bradd's death was an acute aortic dissection, or a tear in the aorta. [Filing No. 80-1 at 12; Filing No. 80-1 at 24.] He later reviewed Dr. Kohr's report, but testified that he was unable to comment on the cancer Dr. Kohr had discovered because Dr. Kohr had removed all of the tumors from the body and retained them for study, leaving no observable indication of cancer. [Filing No. 80-1 at 7-11.]

Dr. John N. Eble, M.D., a pathologist and Professor of Pathology, reviewed the reports from the autopsies conducted by Dr. Kohr and Dr. Bryant in an attempt to assess the accuracy of their findings and conclude whether an immediate cause of death could be properly determined. [Filing No. 74-6 at 1.] During the course of this review, Dr. Eble also recut six paraffin blocks from Dr. Bryant's autopsy and made his own slides in order to examine some of Mr. Bradd's tissue himself. [Filing No. 74-6 at 1.] Dr. Eble confirmed Dr. Kohr's discovery of cancer in Mr. Bradd's body, but could not confirm Dr. Bryant's conclusion that there had been an aortic dissection because the sections of the aorta he viewed did not contain evidence that one had occurred. [Filing No. 74-6 at 2-3.] Dr. Eble opined that neither autopsy had revealed the immediate cause of Mr. Bradd's death. [Filing No. 74-6 at 2-3.]

7

Dr. Larry D. Cripe, M.D., a Professor of Medicine in the Division of Hematology and Oncology at Indiana University School of Medicine, reviewed Mr. Bradd's medical records from the Bureau of Prisons as well as Dr. Kohr's autopsy report to determine whether the failure to diagnose Mr. Bradd's cancer before he died constituted a violation of the standard of care. [Filing No. 74-7 at 1.] Dr. Cripe concluded that Mr. Bradd's symptomatology had been non-specific, and therefore failure to diagnose his cancer was not a breach of the standard of care. [Filing No. 74-7 at 2.] He also explained that, for the type of cancer discovered by Dr. Kohr, there are no curative treatments and several published reports approximate the expected median overall survival term to be twelve to eighteen months. [Filing No. 74-7 at 2.]

Dr. Barry L. Singer, M.D., also affirmed that the survival term for a person with the type of cancer discovered by Dr. Kohr is twelve to eighteen months. [Filing No. 80-2 at 1.] Dr. Singer concluded, however, that the cancer was not the cause of Mr. Bradd's death, but rather that the cause of death was an aortic dissection. [Filing No. 80-2 at 1.] He further stated that the failure of the correctional facility to immediately refer Mr. Bradd to an acute care hospital was the direct cause of the dissection, which in turn caused his death. [Filing No. 80-2 at 1.] Dr. Singer opined that earlier referral, when Mr. Bradd complained of abdominal pain, would have prevented his immediate death. [Filing No. 80-2 at 1.]

The Estate initiated this lawsuit on January 21, 2014, [Filing No. 1], and filed the operative Amended Complaint on August 14, 2014, [Filing No. 32]. In the Amended Complaint, the Estate asserts claims under the FTCA for wrongful death and survival damages due to negligence. [Filing No. 32 at 7-9.]

## III.
### DISCUSSION

The United States argues that summary judgment should be granted in its favor because the Estate cannot establish negligence or causation. [Filing No. 74 at 1; Filing No. 74 at 7-11.] Despite the fact that the cause of Mr. Bradd's death remains in dispute, the United States contends that there is no evidence that the medical staff at FCC acted unreasonably in their medical decision-making or breached the standard of care. [Filing No. 74 at 7-10.] In addition, the United States maintains that without knowledge of Mr. Bradd's cause of death, "any proffered expert testimony by the Estate attempting to link actions by the medical professionals at the FCC-Terre Haute to his death would be speculative and could not establish causation as a matter of law." [Filing No. 74 at 11.] The United States also asks the Court to limit the possible damages the Estate could recover based on expert testimony which suggests that, had Mr. Bradd survived past January, 22, 2012, he would not have lived longer than eighteen months before eventually succumbing to his cancer. [Filing No. 74 at 11-12.]

In response, the Estate contends that summary judgment is improper because material facts—namely, Mr. Bradd's cause of death—remain genuinely in dispute. [Filing No. 80 at 3-9.] The Estate further argues that it has alleged facts and presented evidence such that a reasonable trier of fact could find that prison officials were negligent in delaying Mr. Bradd's access to medical care and thereby breached their duty of care and proximately caused his premature death. [Filing No. 80 at 5-9.] Finally, the Estate argues that the Court should not limit the possible damages to an eighteen-month period because a damages award is "a question solely for the [trier

9

of fact].″[1]  [Filing No. 80 at 9.]

In its reply, the United States maintains that the Estate has offered insufficient evidence to support a finding of negligence. [Filing No. 81 at 1-2.]  The United States also contends that the Court can rule as a matter of law on any issue raised at the summary judgment stage, including damages, and asks the Court to limit the possible damages award to lost earnings of the decedent—which would amount to zero damages because he would have died in prison—and reasonable funeral and burial expenses based on a strict construction of Indiana's wrongful death statute. [Filing No. 81 at 3-4.]

This action involves a claim of negligence against the United States, brought pursuant to the FTCA, regarding an incident that occurred at the FCC facility in Indiana. [Filing No. 32.]  Accordingly, the state law of Indiana controls as to the question of liability and damages. 28 U.S.C. § 1346(b). *See also, e.g., United States v. Olson,* 546 U.S. 43 (2005) (interpreting the FTCA to mean that the United States waives sovereign immunity only where state law of the place where the act or omission occurred would render a private person liable in tort).[2]

---

[1] The Estate frequently makes reference to the jury in its Response to Defendant's Motion for Summary Judgment. [Filing No. 80.]  As the United States correctly points out in a footnote in its Reply Brief, [Filing No. 81 at 2], this matter will be tried by the Court without a jury. 28 U.S.C. § 2402.

[2] In its Response to Defendant's Motion for Summary Judgment, [Filing No. 80], and Response to Order to Show Cause & Statement of Claims, [Filing No. 76], the Estate references case law establishing the standard of deliberate indifference for a violation of the Eighth Amendment. It argues, without a citation to legal authority, that "[a] violation of the Eighth Amendment is sufficient to prove the Defendant was negligent." [Filing No. 80 at 5.]  Deliberate indifference is a different—and higher—standard than negligence, *see, e.g., Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("deliberate indifference entails something more than mere negligence"), and while that would suggest as a matter of logic that establishing a violation of the Eighth Amendment would also establish negligence, the legal analyses are not interchangeable. Additionally, the Estate does not purport to bring a claim under the Eighth Amendment in the Amended Complaint. [*See* Filing No. 32.]  Accordingly, the Court will apply the standard for negligence as set forth under Indiana law.

10

Under Indiana law, "[a] plaintiff seeking damages for negligence must establish (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Kader v. State, Dep't of Correction*, 1 N.E.3d 717, 727 (Ind. Ct. App. 2013) (quoting *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011)). "When there is no genuine issue of material fact and any one of these elements is clearly absent, summary judgment is appropriate." *Kader*, 1 N.E.3d at 727 (quotations and citations omitted). Generally, however, disposal by summary judgment will not be proper for a negligence action. *Kincade v. MAC Corp.*, 773 N.E.2d 909, 911 (Ind. Ct. App. 2002).

"[T]he duty of a custodian of inmates is to exercise reasonable care to preserve the life, health, and safety of the person in custody" by taking "reasonable steps under the circumstances." *Kader*, 1 N.E.3d at 728 (quotations omitted) (quoting *Sauders v. Cnty. of Steuben*, 693 N.E.2d 16, 18 (Ind. 1998)). What constitutes reasonable steps "will vary according to the facts and circumstances presented in each case." *Kader*, 1 N.E.3d at 728 (quotations and citations omitted). Thus, the determination regarding whether the prison's duty to an inmate has been breached is necessarily a fact-dependent analysis.

Proximate cause is also a question of fact. *Hellums v. Raber*, 853 N.E.2d 143, 146 (Ind. Ct. App. 2006). "An act or omission is said to be a proximate cause of an injury if the resulting injury was foreseen, or reasonably should have been foreseen, as the natural and probable consequence of the act or omission." *Funston v. Sch. Town of Munster*, 849 N.E.2d 595, 600 (Ind. 2006). Any given injury may have multiple proximate causes, and a party's negligence need only be one of the proximate causes in order to establish liability. *Id.*

With respect to damages, there are two alternative theories upon which a plaintiff may recover in a case involving an act of negligence and a subsequent death: wrongful death and

survival. *See Atterholt v. Robinson*, 872 N.E.2d 633, 640 (Ind. Ct. App. 2007). Wrongful death damages are intended to compensate survivors for losses associated with the decedent's death if the death was caused by the defendant's negligence, while damages for survival are intended to compensate the decedent for injuries suffered as a result of the defendant's negligence if the decedent later dies as a result of a separate, independent cause. *Id.* Both causes of action are created by statute, and while a claimant may allege both provided that there is evidence to support each, he or she will ultimately be able to recover damages under only one theory. *Cahoon v. Cummings*, 734 N.E.2d 535, 542-43 (Ind. 2000) (discussing *American International Adjustment Co. v. Galvin*, 86 F.3d 1455 (7th Cir.1996)). However, if it is clear from the evidence that the decedent's death was in fact caused by the defendant's negligence, only damages for wrongful death may be claimed, because only those damages—and not damages for survival—could be shown. *Cahoon*, 734 N.E.2d at 542-43.

Here, the Estate seeks damages under both wrongful death and survival theories. [Filing No. 32 at 7-9.] And both parties acknowledge that the evidence presented leaves unresolved one critically important question of fact—the cause of Mr. Bradd's death. In moving for summary judgment, the United States seems to assert either that this fact is not material and therefore resolving the dispute is unnecessary, or that the Court must accept the factual assertions it makes in support of its motion. It argues that regardless of the cause of death, the prison medical staff acted with reasonable care, and because of the lack of an identified cause of death, causation cannot be established as a matter of law. This position is problematic because it depends on the Court making findings of fact with respect to disputed issues, something the Court cannot do at the summary judgment stage.

Granting summary judgment in favor of the United States would require the Court to find that the duty of care was not breached by any of the actors named in the Amended Complaint, [Filing No. 32], and that finding would not be supported by uncontroverted evidence. The named actors include both non-medical correctional officers employed by the Bureau of Prisons (Officer Timcheck and Does 1-4) as well as prison medical staff (Does 5-8, which later filings seem to indicate are Nurse Mize, Dr. Tabor, Dr. Wilson, and the entity that employs them). [Filing No. 32 at 3-4.] In light of the conflicting opinions of Dr. Cripe and Dr. Singer, the Court cannot determine as a matter of law that the standard of care was not breached by any of FCC's medical staff without making an impermissible assessment of the credibility and weight of the evidence. Moreover, while the United States presents undisputed evidence regarding Officer Timcheck's actions and involvement with respect to Mr. Bradd, there is nonetheless a separate question of fact regarding whether those actions were reasonable under the circumstances. Although the United States asserts that they were, the evidence presented by the Estate, including Dr. Singer's opinion, suggests otherwise. The Court cannot make the determination that the United States urges without resolving this factual dispute.

In addition, the United States seems to presume that because a cause of death has not been definitively established by undisputed evidence, the cause of death question will not or cannot be resolved. In asking the Court to accept its argument that the lack of a definitive cause of death prevents the Estate from establishing causation as a matter of law, the United States is essentially asking the Court to make a finding of fact that Mr. Bradd's cause of death is undeterminable. Again, this finding is not supported by uncontroverted evidence. The parties have each presented evidence suggesting conflicting theories about Mr. Bradd's death: one expert opined that he died of cancer, while two others blamed an aortic dissection, and yet another stated that neither of the

autopsies had correctly established the cause of death. [Filing No. 74-3 at 20-25 (Dr. Kohr's autopsy report); Filing No. 74-5 at 10-15 (Dr. Bryant's second-look autopsy report); Filing No. 74-7 at 1-3 (Dr. Cripe's declaration); Filing No. 80-2 at 1-2 (Dr. Singer's opinion).] In a later stage of the proceedings, it will be the duty of the trier of fact[3] to determine the credibility of each of these experts and weigh the evidence to ultimately resolve this dispute. If a cause of death can be identified, the United States' argument that causation cannot be established as a matter of law would fail. At that point, a reasonable trier of fact could find in favor of the Estate by determining, as a matter of fact, that the death—or, alternatively, in the context of a survival claim if the death was not caused by the United States, any injuries preceding the death—was proximately caused by the United States' negligence.

Moreover, the factual dispute regarding cause of death also prevents the Court from making any legal rulings with respect to damages. Without a determined cause of death or a finding that no such determination can be made, the Court cannot even assess which of the Estate's theories of recovery—wrongful death or survival—would prevail. Consequently, a decision to limit damages according to the principles the United States maintains are applicable in wrongful death cases is premature, speculative, and improper at the summary judgment stage.

In sum, each of the parties has produced evidence such that the cause of Mr. Bradd's death is genuinely in dispute, and that fact is material to deciding key issues in this litigation. Summary judgment is improper when disputes of material fact remain.

---

[3] As has already been pointed out, the Court will be the ultimate factfinder in this case pursuant to 28 U.S.C. § 2402. However, the Court has not yet assumed that role, and cannot do so during the summary judgment stage.

## IV.
### CONCLUSION

For the foregoing reasons the Court **DENIES** the United States' Motion for Summary Judgment. [Filing No. 73.] The Court requests that the Magistrate Judge confer with the parties to address the possibility of an agreed resolution, or to establish a schedule for trial.

Date: June 29, 2016

*/s/ Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**